# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 7, 2014 Session

## STATE OF TENNESSEE v. CHRISTOPHER SWIFT AND MARQUAVIOUS HOUSTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-04531     James C. Beasley, Jr., Judge**

---

**No. W2013-00842-CCA-R3-CD  - Filed May 5, 2015**

---

A Shelby County Criminal Court Jury convicted the appellants, Christopher Swift and Marquavious Houston, of first degree premeditated murder; attempted first degree premeditated murder, a Class A felony; and employing a firearm during the commission of a dangerous felony, a Class C felony.  After a sentencing hearing, they received effective sentences of life plus twenty-six years.  On appeal, the appellants contend that (1) the trial court erred by refusing to sever their trials; (2) the trial court erred by allowing the State to display an assault rifle for demonstrative purposes when the rifle was not used to commit the crimes; (3) the trial court erred by allowing the surviving victim to testify after the police destroyed his recorded statement; and (4) the evidence is insufficient to support the convictions.  In addition, Houston contends that (5) the State's failure to name the predicate felony in count 3 of the indictment, employing a firearm during the commission of a dangerous felony, voids the charge and (6) that the trial court erred by ordering consecutive sentencing.  Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court committed reversible error in Swift's case by refusing to sever the appellants' trials and by allowing the State to show the jury an assault rifle that was not used in the crimes.  Therefore, his convictions are reversed, and his case is remanded to the trial court for a new trial.  Houston's convictions and sentences, however, are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Reversed in Part, and the Case is Remanded in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined.  TIMOTHY L. EASTER, J., filed a separate opinion, concurring in part and dissenting in part.

Charles Mitchell (on appeal and at trial), Memphis, Tennessee, for the appellant Christopher Swift.  Lance R. Chism (on appeal) and Larry Copeland (at trial), Memphis, Tennessee, for

the appellant, Marquavious Houston.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Fleming and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

This case relates to the shooting of Marco Blockmon and Demarus Smith on January 17, 2011. Blockmon died at the scene, but Smith survived. The appellants were tried jointly in November 2012.

At trial, Gertrude Bolden testified that Marco "Cho-Cho" Blockmon was her son and that he repaired cars for a living. In November 2010, Blockmon brought a car to Bolden's house to be repaired. Marquavious Houston was with Blockmon. Bolden said that the car looked like it had been parked for a long time because it was covered with dead leaves and debris and that it stayed at her house for one to two weeks because Blockmon did not have the parts to fix it. Bolden said she told Blockmon that if he was not going to fix the car, he needed to "give it back." At some point, the car was moved from her property.

Bolden testified that sometime after the car was moved, Houston came to her home and claimed that Blockmon had his car and keys and would not return them. Bolden said Houston was "ranting and raving and, you know, cursing and going on," so she told him to leave. She also told him that she would tell her son that Houston had come by the house, looking for the car and keys. Sometime later, Houston's mother, "Kim," also came to Bolden's home. Bolden told Kim that she did not know anything about the situation but that she would get the keys from Blockmon and give them to Kim because she did not want Houston on her property anymore.

Bolden testified that on the morning of January 17, 2011, she told Blockmon that she needed him to repair her station wagon. Blockmon told Bolden that he would "get started on that," and Demarus "Boodie" Smith arrived. Later that day, Bolden learned Blockmon had been killed. After Blockmon's death, the police showed Bolden a six-photograph array containing Houston's photograph, and she identified him as the man who came to her home, looking for the car.

On cross-examination by Houston, Bolden testified that when she asked Houston to leave, he "kept standing there for a minute cursing and going off." However, "[e]ventually,

he left." At that time, the car already had been moved from Bolden's property. Bolden said she heard that Houston came to her house again, but she did not see him. She said that when she asked her son what happened to the car, he told her that he gave it back to Houston.

Chestine Blockmon, Marco Blockmon's sister, testified that in January 2011, she was living with her mother and Marco[1] on Looney Street in Memphis. Sometime near Thanksgiving 2010, Chestine saw Houston because "they came to the house and brought a car over for [Marco] to work on." She described the car as a black Camaro and said Marco was supposed to repair it for Houston. At some point, the car was moved from the house, and Marco said he "gave it back." Subsequently, Houston came to the home, looking for Marco and wanting to know the location of the car. Chestine said Houston came to the house about three times. One time he was calm, and twice he was "loud."

On cross-examination, Chestine testified that Houston never threatened anyone and that she never saw him with a weapon. She said he "just wanted his car back and that's all he was saying."

Officer Chad French of the Memphis Police Department (MPD) testified that about 1:30 p.m. on January 17, 2011, he was dispatched to the intersection of J. W. Williams Lane and Decatur Street for a car possibly going off the road and hitting a pole. When he arrived two or three minutes later, he saw a red Crown Victoria with two occupants in the front seat. The passenger, Marco Blackmon, was unresponsive, but Officer French was able to speak with the driver, Demarus Smith, briefly before paramedics arrived. Smith told Officer French that he had been shot and that he could not move. Officer French asked who shot him, and Smith answered, "Jerry Lawler and Qua-Qua or KK." Smith said he had been chased down by Jerry Lawler and Qua-Qua, who were in a blue Saturn. Officer French saw shell casings on the ground. On cross-examination by Swift, Officer French acknowledged that it had been raining that day.

Officer John Stone of the MPD's Crime Scene Investigation Unit testified that he went to the scene and saw a car "wreck[ed] out." One deceased person, Blackmon, was in the front passenger seat, and Officer Stone saw "round bullet holes all around the vehicle." The car's windows were broken out, and the car had "heavy" front-end damage where it had come to rest. Two bullet holes were in the driver's seat, and Officer Stone saw bullet holes in the jacket Blackmon was wearing. A red substance that appeared to be blood was on the jacket. When the medical examiner arrived, he lifted Blackmon's jacket, and Officer Stone saw bullet holes in Blackmon's back.

---

[1]Because the witness and the victim share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

Officer Stone testified that seven shell casings and one bullet fragment were "down the street by Decatur." The shell casings were those of 7.62x39mm ammunition. The Crown Victoria was towed to the crime scene facility and processed for evidence. Officer Stone found ten exterior holes where bullets had entered the car. He described the bullet holes as follows: three holes in the trunk lid, two holes in the rear bumper, one hole in the right rear fender, one hole in the frame around the right side of the rear window, one hole in the front passenger door, one hole in the left rear fender near the gas tank cap, and one hole in the right wheel well. Officer Stone found numerous bullet holes inside the car, including the trunk, the "firewall" separating the trunk from the passenger compartment, the back seat, the driver's seat, and the front passenger seat. He also found a bullet fragment on the dashboard in front of the steering wheel and inside a rear tire.

On cross-examination by Houston, Officer Stone described 7.62x39mm ammunition as "an assault rifle round." He acknowledged that such rounds were usually associated with AKA, SKS, or M16 weapons, which he described as high-velocity assault rifles. He said that he did not find shell casings associated with any other ammunition at the scene.

On redirect examination, Officer Stone testified that he was visually familiar with assault rifles. The State showed him a firearm, and he acknowledged that it looked like a standard assault rifle.

On recross-examination by Houston, Officer Stone acknowledged that the rifle shown was "one version of rifle that fires [7.62]." He also acknowledged that some assault rifles were made with folding stocks and that the rifles could "come in all sorts of shapes and sizes." On recross-examination by Swift, Officer Stone acknowledged that he never examined an SKS, AK47, or other type of assault rifle associated with this case.

Lieutenant Deborah Carson of the MPD Homicide Bureau testified that on January 17, 2011, she went to the hospital to speak with Demarus Smith. When she arrived, Smith was lying face-down on the ambulance stretcher. He was in critical condition and waiting to go into surgery. Lieutenant Carson asked if he knew who was responsible for the shooting, and he told her, "Qua-Qua and Jerry Lawler." Later that day, Lieutenant Carson determined that "Qua-Qua" was appellant Marquavious Houston and that "Jerry Lawler" was appellant Christopher Swift. The next day, she tried to speak with Smith again, but he was in ICU, intubated, and unable to talk with her.

Demarus Smith testified that on January 17, 2011, he planned to work on his car with Marco Blockmon, whom he had known for twenty-one years. About 11:00 a.m., Smith picked up Blockmon at Blockmon's house. Smith was driving his 1996 red Crown Victoria. Smith stopped by someone's house to pick up a tool, and Blockmon waited in the car. When

Smith got back into his car, he noticed that he had missed a call from "Qua-Qua," Marquavious Houston. Smith said he had known Houston for four or five years and that Blockmon was supposed to be working on Houston's car. Blockmon did not have a telephone, so Houston would contact Blockmon through Smith. In fact, Houston had contacted Smith several times about the car. Smith asked Blockmon if Blockmon wanted to return Houston's call, and Blockmon said he would call Houston later.

Smith testified that he and Blockmon were going to a friend's house on Lane Street so they could work on the Crown Victoria. Smith drove south on Decatur and stopped at a stop sign at the intersection of Decatur and North Parkway. A turquoise Saturn pulled up on the driver's side of Smith's car. Smith said that Houston was driving the Saturn and that Christopher Swift, whom he knew as "Jerry Lawler," was in the passenger seat. Smith assumed Houston wanted to speak with Blockmon, so he opened his door in order for the two men to talk. Smith said, "And they had a few words, it wasn't no bad words or nothing like that at first." Blockmon told Houston that he was going to work on Houston's car later, and Houston "was like he needed to fix [the] car now."

Smith testified that he pulled away from the stop sign and that he heard gunshots. He looked behind him and saw the Saturn. He said that he saw Swift with an assault rifle and Houston with a small caliber handgun and that Swift was "[h]anging out sitting on the windowsill." Swift was on Smith's right side and was shooting directly at the Crown Victoria. Smith said that he tried to drive fast but that the streets were wet, causing his tires to spin. He said that bullets were "coming through the car, through the windows, all through my car" and that he heard ten to fifteen gunshots. Blockmon told Smith that he had been "hit" and passed out. Blockmon then "come back to his senses throwing up blood." As Smith prepared to turn right on J. W. Williams Lane, a bullet hit his lower back, and the right side of his body went numb. He said his car "jumped the sidewalk" and crashed into a telephone pole.

Smith testified that as his car stopped, he heard four or five more gunshots from the Saturn. He said that he telephoned his wife, who called 911, and that he called his mother. Someone named "Eric" walked up to his car and told Smith's mother that Smith had been shot. Paramedics arrived, put Smith onto a stretcher, and cut off his clothes. In addition to having been shot in the back, he had been shot in the shoulder. Blockmon was deceased.

Smith testified that he spent almost two months in the hospital and that he had four surgeries. On January 24, 2011, the police showed him two photograph arrays, and he identified the photograph of "Qua-Qua" in the first array and "Jerry Lawler" in the second array. While he was in the hospital, he learned that Qua-Qua's real name was Marquavious Houston and that Jerry Lawler's real name was Christopher Swift. After Smith got out of

the hospital in March 2011, he received his cellular telephone from a detective. Smith checked his phone and discovered that about thirty minutes before the shooting, Houston left him a voice message. Smith listened to the message. Smith stated that in the message, Houston said he had just seen Smith and Blockmon. Houston told Smith to ask Blockmon what Blockmon was going to do because Houston wanted his car fixed. Houston stated that if Blockmon did not fix Houston's car, Houston had "something" for Smith and Blockmon. Smith said he returned his phone to the police. The State played the voice message for the jury.

Smith testified that Swift telephoned him after he got out of the hospital but that he hung up the telephone as soon as he heard Swift's voice. Another person telephoned Smith and offered him $5,000 to $10,000 not to appear at the appellants' preliminary hearing. Smith said that he told the person that "[t]hey can keep their money" and that he was present at the hearing. He acknowledged that he knew someone with the nickname "White Boy" and said that White Boy "had words" with him about this case. He denied that White Boy's parents offered him money not to come to court. He acknowledged that he had one prior conviction for reckless homicide in 2010, two prior convictions for attempted voluntary manslaughter in 2006, and several prior drug convictions. At the conclusion of his testimony, Smith identified Houston and Swift in court as "Qua-Qua" and "Jerry Lawler," respectively.

On cross-examination by Houston, Smith testified that before Houston took the Camaro to Blockmon, Houston asked Smith if Blockman did good work. Smith told Houston yes. Smith acknowledged that one time, he and Houston went to Blockmon's house, looking for the car. The Camaro was there, and Houston was calm and did not threaten anyone. However, sometime after that, Houston left a threatening message on Smith's phone. Smith said that by "threatening," he meant that Houston "was saying that I had something to do with [Blockmon] doing this, doing that, that I'm going to get it too, you know." He acknowledged that Houston never threatened to shoot him and said that Houston did not have a "quick" temper. He also acknowledged that Houston held him responsible for the loss of Houston's car.

Smith testified that when the Saturn pulled up beside him at the stop sign, Swift, who was in the passenger seat, was closer to him than Houston. He said Houston was "a little hostile that day. I guess he was tired of playing cat and mouse with [Blockmon]." Smith said Houston had been looking for Blockmon constantly and could not contact him, "[s]o I guess he was hot once he saw him in the car with me that day. You know, he was already fired up." Smith said that he pulled away from the stop sign because he was not involved in the situation and because Houston should not have had a problem with him. About ten seconds later, he heard an automatic weapon fire ten to fifteen shots. He said he looked in

-6-

his rearview mirror and saw Houston and Swift shooting at the Crown Victoria. Houston was holding a handgun out of the driver's window with his left hand and driving the Saturn with his right hand. Smith saw the muzzle of Swift's automatic weapon flashing from Swift's firing it. Smith could not duck down because he was driving. After he wrecked the Crown Victoria, he heard four or five more shots from an automatic weapon. He said that after the shooting, Houston did not offer him money but that "[i]t was one of their friends or something." He acknowledged that Houston never contacted him after the shooting, and he denied talking to anyone in Houston's family.

On cross-examination by Swift, Smith acknowledged that on January 19, 2011, he gave a recorded statement to Sergeant Connie Justice at the hospital. He also acknowledged that he told Sergeant Justice that he had known Houston for ten years, not four or five years. Smith explained, "I've been familiar with him four or five years. I've been knowing his family for ten years." Smith said that prior to January 17, 2011, he had spoken with Swift but had never "associated" with him. At first, Smith denied talking with Swift or having a conversation with him after the shooting. However, Smith then stated that they had "[a] [f]ew words, if [that's] what you call a conversation."

Roshakita Irving, the mother of Houston's child, testified that in January 2011, she lived in Oxford, Mississippi, and owned a blue Saturn. On January 17, Houston had Irving's car. About 10:00 p.m., he came to Irving's home, where she was living with her mother, and told Irving that "he had just got in an altercation with Boodie and Cho-Cho." Houston also told Irving that "something was said about his car and . . . his car was supposed to be fixed on by Boodie or Cho-Cho" and that a shooting had occurred. Irving said that Houston stayed with her for four or five days. One day, they were watching the news on television, and Irving saw a picture of a red Crown Victoria and heard about a shooting. She asked Houston if that was the car involved, and he said yes. He also told her that he had been driving the Saturn at the time of the shooting. Irving and Houston looked on the computer to see if the police had a warrant for Houston's arrest, but no warrant had been issued. Later, they checked the computer again for a warrant, and a warrant had been issued. Houston was going to turn himself in to the police. In March 2011, Irving was subpoenaed for a hearing involving Houston. Houston told Irving to "plead the Fifth." He also told her to "[p]lead the Fifth" at trial.

On cross-examination by Houston, Irving testified that she never wanted to testify against Houston and that she asked him how she could prevent herself from having to testify. She acknowledged that he then told her to "plead the Fifth." When Houston came to Oxford after the shooting, he told Irving that he did not have a weapon or fire a weapon that day. She acknowledged telling police that, according to Houston, the shooting occurred after Demarus Smith exchanged words with another person and then Smith said something to that

person. She also acknowledged that Houston told her that he did not intend for anyone to get hurt and that he had only wanted his car returned to him.

Survonder Smith, Demarus Smith's wife, testified that about two days after the shooting, her husband was still in ICU. Someone approached her and asked if her husband would accept $5,000 not to testify. When she said no, the person offered $10,000. On cross-examination by Houston, Mrs. Smith testified that the person's name was "Derrick" and that she and her husband turned down Derrick's offers. On cross-examination by Swift, Mrs. Smith testified that she did not know Derrick or who sent him.

Robert Sims testified that his nickname was "White Boy." He said that in March 2011, Houston asked him to contact Demarus Smith and talk to Smith about not coming to court. Sims told his mother to offer Smith $10,000. On cross-examination by Houston, Sims testified that he did not know Houston personally but had known of him for years. On cross-examination by Swift, Sims said he had never gone by the name Derrick.

Sergeant Connie Justice of the MPD's Homicide Bureau testified that she was the coordinator for this case. On the day of the incident, she determined that the suspects were "Qua-Qua" and "Jerry Lawler" and that "Qua-Qua" was Houston and that "Jerry Lawler" was Swift. Two days later, she created two, six-photograph arrays containing Houston's and Swift's photographs and showed them to Demarus Smith. Smith identified both appellants. Sergeant Justice learned that Houston's cellular telephone was registered to Shannon Marshall in Oxford, Mississippi, and that Marshall was Roshakita Irving's mother. Officers went to Marshall's home and saw a Saturn that matched the description of the suspect car.

Sergeant Justice testified that Irving answered the door, allowed Sergeant Justice into the home, and provided Sergeant Justice with information about the crimes. Irving also allowed Sergeant Justice to search the Saturn. Sergeant Justice did not find any weapons, ammunition, or shell casings in the car. At some point, Sergeant Justice learned that telephone calls had been made to Smith, offering him money. She also became aware of jailhouse telephone calls made by Swift and Houston that were related to this case. On the day of the appellants' preliminary hearing, Smith told Sergeant Justice about a voice message on his cellular telephone.

On cross-examination by Houston, Sergeant Justice testified that she did not have the Saturn analyzed for gunshot residue. On cross-examination by Swift, Sergeant Justice testified that on January 29, 2011, she took a statement from Smith at the hospital. The statement was recorded with a digital recorder and transcribed, but Sergeant Justice did not know the location of the recording. She acknowledged that the police eventually arrested Swift for his involvement with this case. Sergeant Justice advised Swift of his rights, and

Swift waived them. He denied having any knowledge of the shooting and told her that he knew Houston but had not seen him recently. Sergeant Justice acknowledged that a weapon was never recovered in this case and that she never obtained a search warrant for Swift's residence. On the day of the appellants' preliminary hearing, Smith advised Sergeant Justice about a voice message on his telephone. Sergeant Justice had had possession of Smith's telephone after the shooting. However, she had been unable to access his voice messages because she did not have the "pass code."

Teri Arney, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in firearms identification that she conducted ballistics testing and made comparisons on evidence collected in this case. She said that she received seven fired cartridge cases and that all of them came from 7.62x39mm ammunition, which was typically fired from semiautomatic or automatic rifles such as an SKS, AK47, or AKM rifle. She said those rifles fired ammunition at higher velocities than pistols. Agent Arney also examined eight bullet fragments recovered from Blockmon's body and Smith's Crown Victoria. Four of the fragments contained bullet jacket fragments, which allowed her to compare them under a microscope. She determined that all four had been fired from the same firearm. The remaining four did not have any markings for comparison, so she was unable to determine whether they had been fired from the same weapon. She stated that the stocks of some automatic weapons could be folded. Also, a person could cut off the stock. Therefore, the size of an automatic weapon could "vary a lot." She said the length of an unaltered assault rifle was about twenty-six to thirty inches.

On cross-examination by Houston, Agent Arney testified that a person could cut off both the stock and barrel of an automatic rifle, making the rifle much smaller than a normal assault rifle. She acknowledged that 7.62mm ammunition was more likely to travel through "a combination of obstacles such as steel, cloth, steel" than ammunition for a forty-caliber or nine-millimeter weapon and said that 7.62mm ammunition "could potentially go through more barriers." On cross-examination by Swift, Agent Arney testified that she was not aware of any handguns that fired 7.62mm ammunition.

Dr. Miguel Laboy, an assistant medical examiner for Shelby County, testified that he performed Blockmon's autopsy. Blockmon had a gunshot wound in his back. The bullet perforated his left lung and lacerated his heart, and blood accumulated in his left chest and along his heart. Blockmon also had a gunshot wound in his right forearm, and his right radius was fractured. Dr. Laboy found bullet fragments in Blockmon's heart and superficially embedded in his left shoulder. He said Blockmon also had superficial lacerations and abrasions on his back and left flank and tested positive for marijuana. Dr. Laboy concluded that the gunshot wounds to Blockmon's back and right forearm caused his death.

Juaquatta Harris of the Shelby County Sheriff's Department testified that she was responsible for downloading telephone calls made by jail inmates. At the prosecutor's request, Harris retrieved telephone calls made by the appellants.

The State played portions of the calls for the jury. During a call made by Houston, Houston's mother told him that she had tried to call someone every day but that "[he] ain't answer." Houston stated, "I had got White Boy to call him, but they don't answer." In another call, Roshakita Irving told Houston that she did not want to testify against him but that she did not have any choice. Houston told Irving that if she testified at trial, "I'm gone." He also told her that she could "plead the Fifth."

In a call by Swift, an unidentified male answered, and Swift asked to speak to "Boodie." The male asked, "Who this?" Swift answered, "Lawler, man." Swift told the male that someone was supposed to call him, and the male stated, "Alright."[2] The call then ended. In another call from Swift, an unidentified male answered, and Swift again asked for "Boodie." The male stated, "He ain't here right now." In a second call made immediately thereafter, Swift told a second unidentified male that he was going to court the next day, that he had just tried to call "Poo Puddin," and that "it sounded like him on the phone."[3] In a call the next day, Swift told an unidentified male that "he showed up." The male stated that "[he] would have did that anyway, with or without the money, fool." After playing the recordings, the State rested its case.

Kenya Gaines, Houston's mother, testified for him that she went to Blockmon's house several times, looking for her son's car. The car was never there and was never returned to Houston. Gaines spoke with Damarus Smith one time after the shooting.

On cross-examination by the State, Gaines testified that Houston and Swift went to school together and that Swift's nickname was "Jerry Lawler." She denied that Houston and Swift used to "hang out a lot." When asked if Houston and Swift were good friends, Gaines answered, "I assume."

Leotha Williams, Jr., testified for Swift that he was Swift's uncle and had custody of Swift until Swift turned twenty-one years old. On January 17, 2011, Williams was living in an apartment on North Bellvue with Swift and Swift's "lady friend," Brittany Junious. Williams said that Swift and Junious were at home all morning, that he woke them, and that Swift and Junious left the apartment about 1:00 or 2:00 p.m. Williams did not know whether

---

[2]During closing arguments, the State argued that the male was Smith.

[3]During closing arguments, the State argued that "Poo Puddin" referred to Smith.

they left together. He said he did not know Marco Blockmon and had never heard Swift speak harshly of Blockmon or Smith.

Brittany Junious testified that she was Swift's girlfriend. On January 17, 2011, she and Swift were at his uncle's home. That morning, they played dominoes and watched television. They left the apartment together about 4:00 p.m., and Swift did not get into a blue Saturn. Junious said she had never heard Swift say harsh words about Blockmon or Smith. She acknowledged that she knew Swift as "Lawler."

On cross-examination by the State, Junious acknowledged that she loved Swift and did not want him to get into trouble. On January 17, 2011, she found out about the shooting on the news. One or two days later, the police came to Williams's apartment, and Junious learned that Swift was involved. She said that the police were looking for Swift and that she told the police he "might be outside somewhere." Junious told Swift's lawyer that Swift was with her at the time of the shooting, but Junious never gave a statement to the police.

Chestine Blockmon testified on rebuttal for the State that she saw the black Camaro after the shooting. Specifically, she stated that she "saw it every morning down when I was taking my children to school, it will pass right by me. And I know it was the car cause the damage it had." Chestine identified three photographs of a black Camaro. She stated that she took the photographs at a gas station on Thomas Street, that she took the photographs "last summer," and that "[a]n elderly lady with a low haircut" was driving the car. She said that she had "also seen it several other times" and that Houston's mother was driving the car.

On cross-examination by Houston, Chestine testified that she recognized the Camaro by a dent "where you would open the door" and from rust underneath the bumper. She said that she took the photographs "toward the end of last summer when it started getting cool" but that she first saw the car a few weeks after the shooting. She said that she "regularly" saw Houston's mother driving the car and that she would notify Sergeant Connie Justice "[m]ost of the time that I saw it." She said she reported the sightings to Sergeant Justice because "from what I was hearing that the car supposedly disappeared, you know, but I was seeing the car." On cross-examination by Swift, Chestine acknowledged that she was saying Houston's family got the car back.

The jury convicted the appellants as charged of first degree premeditated murder; attempted first degree premeditated murder, a Class A felony; and employing a firearm during the commission of a dangerous felony, a Class C felony. After a sentencing hearing, they received effective sentences of life plus twenty-six years.

## I. Analysis

-11-

A. Motions to Sever

The appellants contend that the trial court erred by denying their motions for severance. Swift argues that severance was necessary because he was "clearly and severely prejudiced by the actions of [Houston's] attorney." Specifically, counsel for Houston "brought out the fact that the kind of ammunition used was an assault rifle round, and opened the door to the jury being shown an AK-47 even though none was in evidence." Houston's counsel also elicited that Swift offered Smith money not to testify. Houston claims that severance was necessary because he and Swift had inconsistent defenses. Specifically, Houston's theory of the case was that Swift was the sole shooter and that Houston was not criminally responsible for Swift's actions while Swift's defense was that he was not even present at the time of the shooting. Houston argues that the jury's hearing both defenses made neither defense believable. He also contends that severance was necessary because he was afraid to testify in front of Swift at trial due to fear of retaliation by Swift. The State contends that the trial court properly denied the appellants' motions to sever. We conclude that the trial court committed reversible error in Swift's case by refusing to sever the appellants' trials but that Houston is not entitled to relief.

The grand jury indicted the appellants jointly. Before trial, Swift filed a motion to sever. At the hearing on the motion, Swift argued that the appellants' trials should be severed because Houston was going to blame Swift for the crimes and potentially testify that Swift was the sole shooter, which was "backed up" by physical evidence that showed only one type of gun was fired at the scene. The trial court noted that if Houston testified at trial, he was subject to cross-examination by Swift and ruled that "[if] one chooses to say the other one did it I don't think that's necessarily an indication that they both can't receive a fair trial." On the morning of trial, counsel for Houston renewed the motion, arguing that "the defenses in this case are completely against each other, judge. . . . I'm going to be pointing my finger at [Swift]." The trial court again denied the motion. During opening statements, counsel for Houston stated, "The forensics are only going to point to one person having a weapon, one person using a weapon. . . . Whatever happened that day was the basis for the reactions and actions of Mr. Swift."

During the trial, counsel for Swift and Houston renewed the motion to sever several times. First, counsel for Houston renewed the motion after Officer Stone's testimony and argued that Houston was afraid to testify in front of Swift because Swift was threatening to retaliate against Houston. Second, both attorneys argued prior to Roshakita Irving's testimony that severance was necessary because Irving was going to give hearsay testimony about statements made by Houston. The trial court again denied the motion for severance but instructed Irving that she could not testify about Houston's statements regarding Swift's involvement in the crimes. Third, during Houston's cross-examination of Irving, counsel for

Swift renewed the motion because Houston was going to have Irving testify that Houston claimed Swift and Smith argued at the stop sign. The trial court ruled that Irving could give such testimony as long as she did not mention Swift's name. Counsel for Swift argued that "that's still a problem" for Swift because "there's been no other testimony there's anyone else in the car [with Houston] but Mr. Swift." The trial court stated that "I don't know any other way to cut it any further than that. And . . . I don't think that that in any way implies that that somebody else was your client." The trial court also stated it would instruct the jury on Irving's testimony.

Tennessee Rule of Criminal Procedure 8(c)(1) permits joinder of defendants in the same indictment "if each of the defendants is charged with accountability for each offense included." Tennessee Rule of Criminal Procedure 8(c)(3)(b) permits joinder of defendants when conspiracy is not an alleged offense but when the offenses charged are "so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." Tennessee Rule of Criminal Procedure 14(c)(2)(A) provides that a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." A trial court may grant a severance of defendants during the trial if, "with consent of the defendants to be severed, the court finds a severance necessary to achieve a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(B). Furthermore,

> [w]hile "mutually antagonistic" defenses may mandate severance in some circumstances, they are not prejudicial per se." State v. Farmer, et al., No. 03C01-9206-CR-00196, 1993 Tenn. Crim. App. LEXIS 420 ([Knoxville,] July 8, 1993) citing Zafiro v. United States, 506 U.S. 534, 537-38 (1993). Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. Id. Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. Id. "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." Id. [(]quoting United States v. Horton, 705 F.2d 1414, 1417 (5th Cir. 1983)[)].

State v. Ensley, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996).

Whether to grant a severance lies within the sound discretion of the trial court. State

v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981)). "This Court has held, 'Where a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was "clearly prejudiced" in his defense as a result of being tried with his co-defendant.'" State v. Mickens, 123 S.W.3d 355, 383 (Tenn. Crim. App. 2003) (quoting State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000)). This court will not find an abuse of the trial court's discretion unless the record clearly shows that the defendant was so prejudiced by the joint trial that the granting of a severance became a judicial duty. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

First, we will address Swift's claim. Unlike the case against Houston, in which the State presented evidence of his anger about the car and his threat to harm the victims shortly before the shooting, the only significant evidence against Swift was Smith's eyewitness account. Had the appellants been tried separately, the State's case would have rested mainly on the jury's having to resolve Smith's testimony with evidence of Swift's alibi. However, due to the joint trial, the jury heard Houston's claim during opening statements that Swift was not only present during the shooting but decided on his own accord to shoot the victims.

Moreover, we agree with Swift that the trial court's allowing Irving to testify that Houston said he heard "someone else" exchange words with Smith at the stop sign as long as she did not mention Swift's name was improper because the evidence had established that the only other person in the Saturn with Houston was Swift. Therefore, even though Irving did not mention Swift's name, she was obviously referring to Swift. See White v. State, 497 S.W.2d 751, 755 (Tenn. Crim. App. 1973). The trial court, apparently recognizing the Bruton problem[4] with Irving's testimony, instructed the jury as follows during her testimony:

> Basically you are trying two cases. You are trying a case against Mr. Houston and a case against Mr. Swift. They are both entitled to have their own cases heard, their having their own cases tried.
>
> And so I will say to you any proof that's presented as to one defendant is presented as to that defendant and you may use it in the trial of that defendant. You may not use it in the trial of the other defendant. So [you've] got to kind of do a mental gymnastics, if you will.

---

[4]In Bruton v. United States, 391 U.S. 123, 126 (1968), the United States Supreme Court held that allowing into evidence a co-defendant's statement that implicated the defendant when the co-defendant did not testify violated the defendant's right to confrontation.

-14-

But both of them are entitled to their own separate trial. And so you're to use the evidence that's presented as it's presented to you. But if it only applies to one, then you're to use it as to one. If it applies to both, you may use it as to both. But does everybody understand that? Okay.

. . . .

Ms. Irving is testifying and the facts that she has testified to relate to Mr. Houston. Okay. And you are not to use them against Mr. Swift, they relate only to Mr. Houston. Okay, does everybody understand that?

During the final jury charge, the trial court also instructed the jury, "You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to that particular defendant. Any evidence which was limited to a particular defendant should not be considered by you as to any other defendant."

Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). However, in this case, we believe the prejudice to Swift and the "mental gymnastics" required by the jury were too great to be overcome by the instructions. Therefore, we are compelled to reverse Swift's conviction and remand his case for a new trial.

As to Houston, he first contends that severance was required because the appellants' opposing defense theories made neither defense believable. However, he has failed to cite to any specific examples of how he was prejudiced by being tried jointly with Swift. Moreover, he has not cited to any evidence introduced against him at trial that would have been inadmissible against him in a separate trial. "[A] severance need not be granted where the evidence which was introduced could have been admitted against [the defendant] in a separate trial." State v. Little, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992).

Houston also contends that severance was required because he was afraid to testify in front of Swift. Initially, we note that Houston failed to raise this issue in his motion for new trial or during his hearing on the motion. Therefore, he has waived the issue. See Tenn. R. App. P. Rule 3(e). Furthermore, Houston made no offer of proof at trial regarding his fear of testifying and nothing indicates that, had Houston been tried separately from Swift, he would have testified on his own behalf. Therefore, we discern no plain error. See Tenn. R. App. P. 36(b). In sum, Houston is not entitled to relief for the trial court's failure to sever the appellants' trials.

B.  Loss of Smith's Recorded Statement

The appellants contend that the trial court erred by refusing to dismiss the case or strike Smith's testimony from the record when the police destroyed a recorded statement Smith gave shortly after the crimes.  The State argues that the trial court properly determined that the loss of the recording did not warrant dismissing the case or excluding Smith's testimony.  We agree with the State.

After Smith's direct testimony, counsel for Swift advised the trial court as follows:

> Judge, it has come to my attention that Ms. Justice took a tape recorded statement of Mr. Demarus Smith who is the witness that is presently testifying.  And that that tape-recorded statement was destroyed.  That recorded statement was reduced I guess to some type of statement, although it was not signed, it was not initialed, it was not adopted by Mr. Smith.

Counsel argued that pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), the court should dismiss the case against Swift or strike Smith's testimony because, without the recording, the defense had no way to determine the accuracy of the transcribed statement and could no longer impeach Smith with the statement.  Counsel for Houston joined in Swift's motion.  The prosecutor advised the court that she had "no explanation for where the tape is" and that she had allowed Smith to review his transcribed statement for trial.  However, she argued that the loss of the recording would not impede defense counsels' ability to impeach Smith because "they will have Ms. Justice who took the statement . . . and has verified that this is [Smith's] statement."  The trial court refused to grant the appellants' motion, noting that "[t]he witness is here to testify or here to be subject to being cross-examined.  I'm assuming again the transcriptionist can testify that that's what I typed.  The detective can testify that's what [Smith] said."  On appeal, the appellants maintain that, pursuant to Ferguson, the State's destruction of the recorded statement denied them of their right to a fair trial.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial.  See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001).  As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In Ferguson, our supreme court addressed the issue of when a defendant is entitled to

relief in the event the State has lost or destroyed evidence that was alleged to have been exculpatory. 2 S.W.3d at 915-18. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id. This court reviews the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. State v. Merriman, 410 S.W.3d 779, 791 (Tenn. 2013).

In this case, Smith was the sole eyewitness to the shooting, and we agree with the appellants that the State had a duty to preserve his recorded statement. Nevertheless, nothing indicates that the police intentionally destroyed the recording or acted in bad faith. During

Sergeant Justice's cross-examination testimony, she explained that she made a digital recording of Smith's statement and uploaded it to her computer. The recording then went into a file so that the transcriptionist could listen to and transcribe it. Sergeant Justice stated that, at that time, "we didn't have a set of protocol for exactly what happens before and after and so, therefore, after she transcribed the tape I no longer know where the digitized portion . . . where it is anymore." Therefore, the degree of negligence in the State's failing to preserve the recording was simple negligence. See State v. Lonnie T. Lawrence, No. E2007-00114-CCA-R9-CD, 2008 Tenn. Crim. App. LEXIS 202, at *43-44 (Knoxville, Mar. 17, 2008) (distinguishing between simple negligence and gross negligence under Ferguson). Regarding the significance of the destroyed evidence, Smith consistently maintained before trial and during trial that the appellants were the shooters, and defense counsel had Smith's transcribed statement. Finally, for reasons that will be explained below, the evidence was sufficient to support the convictions. Therefore, all three Ferguson factors support the trial court's denial of the appellants' motion to dismiss the case against them or strike Smith's testimony.

## C. Demonstrative Evidence

The appellants contend that the trial court committed reversible error by allowing the State to display an assault rifle not used in the crimes. The State argues that Houston has waived this issue because he withdrew his objection to the State's demonstration of the weapon and that, in any event, the rifle was relevant evidence. The State also contends that any prejudice was minimal because the jury saw the rifle only briefly.

On direct examination, Officer Stone testified that the shell casings found at the scene were those of 7.62x39mm ammunition. On cross-examination, counsel for Houston asked the officer to "describe those again," and the officer stated, "[They are] seven point six two by three nine, which is an assault rifle round." The following exchange then occurred:

> Q. Most service people would call that maybe a NATO round; is that right?
>
> A. Yes, that's correct.
>
> Q. And that's usually done with an AKA or SKS or an M16?
>
> A. That's correct.
>
> Q. Or some high impact velocity round?

-18-

A.      It's the high assault rifle, uh-huh.

Q.      Can you compare that, say, to a forty caliber, nine millimeter round?

A.      Can I personally is that what?

Q.      Yes.  Can you do that personally?

A.      No, I cannot do that.

Q.      Can you tell the jury whether the shell casing of a forty or a nine millimeter would of been as large as a seven point six two?

A.      No, I cannot.  I can just determine or I cannot determine, I haven't had the schooling for that.

During the State's redirect examination of Officer Stone, it requested a bench conference and advised the trial court that

> since [defense counsel] has brought up the issue of SK and AK
> and the assault rifle and the size of the rounds and things like
> that, I have one present that I would like to show to this witness
> and ask him . . . if that's the general shape and size of them.

Counsel for Houston objected, arguing that "he's not trained in firearms, this would be something a TBI agent would be better adduced to."

The trial court sent the jury out of the courtroom, and the State asked Officer Stone if he was familiar "with what an assault rifle looks like."  Officer Stone answered yes.  The State showed him an assault rifle and asked him, "And is this commonly what an assault rifle looks like?"  The officer answered, "That's correct."  Upon questioning by the trial court, Officer Stone also stated that such an assault rifle was consistent with having fired the recovered shell casings.  At that point, counsel for Houston argued that the rifle was highly prejudicial and that "[i]f you get to the TBI agent you're going to find out that there's at least three handguns that can fire a seven point six two millimeter, including a Luger and some other things.  I mean, it's not just for an assault rifle."  The State countered that counsel for Houston "brought it up when he asked this officer if isn't it true that that caliber of round is common to an AK, an SK or an assault rifle" and that defense counsel would later have the

-19-

opportunity to ask the TBI agent if handguns could fire that ammunition.[5]  Counsel for Houston stated, "I'll withdraw my objection, judge, put it in."  Counsel for Swift, who had remained silent throughout the discussion, objected, stating, "403, your Honor.  That the prejudicial - prejudice substantially outweighs the probative value, your Honor."  The trial court ruled that the State could show the weapon to Officer Stone.

When the State's redirect examination of Officer Stone resumed, the State showed him the assault rifle and asked, "Is this what a standard AK, SK or assault rifle looks like?"  Officer Stone answered, "That's correct."  The State asked, "This size?"  Officer Stone again answered, "That's correct."  At Swift's request, the trial court then instructed the jury as follows:

> Ladies and gentlemen, for the record, that assault rifle or SK
> what 47 or whatever assault rifle has nothing to do with this
> case.  It's not involved in this case.  It's simply for
> demonstration purposes for him to identify.  Okay.

The State did not introduce the rifle into evidence.  During closing arguments, the State argued that, due to the size of an assault rifle, Houston had to know before the shooting that Swift had the weapon.

The use of demonstrative evidence rests within the sound discretion of the trial court. See State v. Anton Mayhew, No. W2009-02184-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 507, *23 (Jackson, July 8, 2011).  Generally, to be admissible, evidence must be relevant to some issue at trial.  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999).  However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.  It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion.  See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining."  State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal

---

[5]TBI Agent Teri Arney later testified on cross-examination that she was not aware of any handguns that fired 7.62x39mm ammunition.

quotations and citations omitted).

Turning to the instant case, we initially note that Houston withdrew his objection to the State's demonstration of the assault rifle. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Therefore, he will only be entitled to relief if any error rises to the level of plain error. See Tenn. R. App. P. 36(b).

On appeal, the State argues that the rifle was "relevant background evidence to Officer Stone's testimony that an assault rifle fired the 7.62 x 39 round discovered at the scene." We disagree with the State. Officer Stone testified on cross-examination that 7.62x39mm ammunition was typically used in semiautomatic or automatic weapons. We fail to see how the State's then showing the officer such a weapon made that fact any more or less probable. We note that in allowing the State to show the weapon to Officer Stone, the trial court never explained its finding regarding the relevance of the weapon. Moreover, during the motion for new trial hearing, the trial court questioned the relevance of the assault rifle and stated, "In hindsight, I'm not sure I would have allowed the demonstration of that weapon." We conclude that the rifle was not relevant "background evidence."

That said, during closing arguments, the State argued that, due to the size of an assault rifle, Houston had to know before the shooting that Swift had the gun in the Saturn. Based on Houston's claim that he did not know that Swift was going to shoot the victims, the State's demonstrating the size of an assault rifle to the jury was highly relevant to disprove that claim. Furthermore, given the overwhelming proof that an assault rifle was used in the shooting, we cannot say that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. In sum, we conclude that the demonstrative evidence was highly relevant in the State's case against Houston and that the trial court did not err. With regard to Swift's case, though, the size of the rifle was not relevant. In addition, given our previous conclusion that Swift was highly prejudiced by the trial court's failure to sever his case from that of his co-defendant, we cannot say that the error was harmless. Therefore, we are again compelled to conclude that the trial court's error warrants a new trial for Swift.

D. Sufficiency of the Evidence

The appellants contend that the evidence is insufficient to support the convictions. The State argues that the evidence is sufficient. Although we have concluded that Swift's case must be remanded to the trial court for a new trial, in the event of further appellate review, we will address both of the appellants' claims regarding the sufficiency of the

evidence. We agree with the State that the evidence is sufficient.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-13-202(a)(1) provides, "First degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "'[P]remeditation' is an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Relevant to this case, a person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the

actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2); State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

Tennessee Code Annotated section 39-17-1324(b)(1) provides that "[i]t is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." Attempted first degree murder is a dangerous felony. See Tenn. Code Ann. § 39-17-1324(i)(1)(A).

Taken in the light most favorable to the State, the evidence shows that in late 2010, Houston took his Camaro to Blockmon to have it repaired. However, Blockmon refused to give the car back to Houston. Houston went to Blockmon's house several times, looking for the car. Houston also tried to contact Blockmon about the car but was unable to do so and was angry. On January 17, 2011, Smith and Blockmon were on their way to Lane Street so that they could work on Smith's car. Smith stopped at a stop sign, and Houston, driving his girlfriend's Saturn, pulled up on the driver's side of Smith's Crown Victoria. Swift was in the passenger seat of the Saturn. Houston confronted Blockmon about the Camaro, Blockmon said he would work on the car later, and Smith pulled away from the stop sign. Ten seconds later, Smith heard automatic gunfire, looked in his rearview mirror, and saw Houston firing a handgun and Swift firing an automatic weapon. During the shooting, Smith was shot in the back, causing him to crash the Crown Victoria into a pole, and Blockmon was shot in the back and arm. Blockmon died of his wounds, and Smith was severely wounded.

Swift contends that the evidence is insufficient because his identity as the culprit is not credible and because his conviction is based upon circumstantial evidence as opposed to fingerprint or DNA evidence. We disagree. Smith, who knew Swift and Houston only by their nicknames at the time of the crimes, consistently identified them as the shooters immediately after the crimes, at the hospital shortly after the crimes, in a photograph array days after the crimes, and at trial. A victim's identification alone is sufficient to support a conviction. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1987). Therefore, we conclude that the jury accredited Smith's testimony, and based on his identification, any rational trier of fact could have found either appellant guilty of the crimes.

Houston contends that the State failed to prove that he intended to kill the victims or that he was criminally responsible for Swift's actions. In support of his claim, he notes that he told Irving that he did not have a weapon or intend for anyone to get hurt, that no small-caliber casings or bullet fragments were recovered from the scene, and that the State offered

-23-

no proof that he asked or encouraged Swift to fire the assault rifle. However, as stated previously, the evidence shows that Houston had a motive to shoot Blockmon and that he left a voice message on Smith's phone just prior to the shooting, threatening to harm both of the victims. Moreover, the evidence shows that Houston chased Smith's Crown Victoria and fired at the car as Smith tried to get away. The jury, as was its prerogative, obviously accredited the testimony of the State's witnesses and resolved any discrepancies in favor of the State. Therefore, we conclude that the evidence is sufficient to support the convictions.

## E. Sufficiency of Indictment

Houston contends that the State's failure to name the predicate felony in count 3 of the indictment, employing a firearm during the commission of a dangerous felony, voids the charge. The State argues that the indictment provided him with sufficient notice of the crime. We agree with the State.

As stated above, Tennessee Code Annotated section 39-17-1324(b)(1) provides that "[i]t is an offense to employ a firearm during the commission of a dangerous felony." Attempted first degree murder is a dangerous felony. See Tenn. Code Ann. § 39-17-1324(i)(1)(A). Count 3 of the indictment alleged that the appellants "did unlawfully and knowingly employ a firearm during the commission of an offense as defined in T.C.A. 39-17-1324(i)(l), in violation of T.C.A. 39-17-1324(b), against the peace and dignity of the State of Tennessee."

The United States and the Tennessee Constitutions require that an indictment inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment satisfies this constitutional requirement "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). The validity of an indictment is a question of law and, therefore, our review is de novo. State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997).

Initially, Houston notes that he is raising this issue for the first time on appeal. However, because the remedy for an insufficient indictment would be dismissal of the charge, he did not have to raise the issue in his motion for new trial. See Tenn. R. App. P. 3(e) (regarding the waiver of issues not raised in a motion for new trial); State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994) (stating that "[t]he waiver provision of Rule 3(e), however, does not apply when the issue, if found to be meritorious, would result in the dismissal of the prosecution against the accused"). He also did not have to raise the issue before trial pursuant to Rule 12, Tennessee Rules of Criminal Procedure. State v. Demeko

Gerard Duckworth, No. M2012-01234-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 398, at *53 (Nashville, May 10, 2013) (providing that "challenges to the indictment, other than 'a claim that the indictment, presentment, or information fails to show jurisdiction in the court or to charge an offense,' must be raised prior to trial") (quoting Tenn. R. Crim. P. 12(b)).

This court has explained,

> Generally, an indictment for a violation of Code section 39-17-1324 that does not name the underlying dangerous felony does not provide the defendant with adequate notice of the crime charged. This is so even when the indictment, as does the one in this case, tracks the statutory language of Code section 39-17-1324 and names the statute itself. These statutory references are insufficient because Code section 39-17-1324 provides 11 options for dangerous felonies that would support conviction. The failure of the indictment to name the underlying dangerous felony leaves the defendant with inadequate notice of the charges against him.

Id. at *58-59. However, where only one other offense alleged in the indictment qualifies as a dangerous felony under Code section 39-17-1324, "the indictment is 'reasonably clear'" that that offense is the predicate felony for the charge of employing a firearm during the commission of a dangerous felony so that the indictment is not void for lack of notice. Id. at *59-60.

In this case, although count 3 of the indictment did not specify the predicate felony, the indictment alleged only one other offense, that of attempted first degree murder in count 2, that qualified as a dangerous felony pursuant to Tennessee Code Annotated section 39-17-1324(i)(1). Therefore, the State's failure to specify the predicate felony did not void the indictment.

## F. Consecutive Sentencing

Finally, Houston contends that the trial court erred by ordering that he serve his sentences for attempted first degree murder and employing a firearm during the commission of a dangerous felony consecutively to his life sentence for first degree murder because consecutive sentencing was not necessary to protect the public from further criminal conduct by him and because consecutive sentencing does not reasonably relate to the severity of the offenses. The State argues that the trial court properly ordered consecutive sentencing. We

agree with the State.

At Houston's sentencing hearing for the attempted first degree murder and employing a firearm convictions, no witnesses testified, but the State introduced his presentence report into evidence. According to the report, the then twenty-one-year-old Houston was single with a three-year-old daughter. In the report, he said he was an active member of the "Crips" gang, described his mental and physical health as "excellent," and said he did not use alcohol or drugs. The report showed that he worked as a cook for Church's Chicken from July 2007 to February 2010. According to the report, Houston had a prior conviction for possession of marijuana.

The trial court noted that Houston was a Range I, standard offender and applied the following enhancement factors to both of his sentences: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (2), that the defendant "was a leader in the commission of an offense involving two (2) or more criminal actors"; (6), that the injuries inflicted upon Smith were particularly great; (9), that the defendant employed a firearm during the commission of the offense; and (10), that the defendant had no hesitation about committing a crime when the risk to human life was high due to the fact that the shooting occurred in a residential neighborhood. Tenn. Code Ann. § 40-35-114(1), (2), (6), (9), (10). With regard to Houston's sentence for employing a firearm during the commission of a dangerous felony, the trial court also applied enhancement factor (3), that the offense involved more than one victim. Tenn. Code Ann. § 40-35-114(3). The trial court applied no mitigating factors. The court sentenced him to twenty years, the midpoint in the range, for attempted first degree murder, a Class A felony, and six years, the mandatory minimum punishment, for employing a firearm during the commission of a dangerous felony, a Class C felony. See Tenn. Code Ann. §§ 40-35-112(a)(1), 39-17-1324(h)(1). The court ordered that Houston serve the sentences consecutively to each other and his statutorily mandated life sentence for first degree premeditated murder.[6]

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Additionally, our supreme court has

---

[6]Houston acknowledges that he must serve count 3 consecutively to count 2 pursuant to Tennessee Code Annotated section 39-17-1324(e)(1).

held "that the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). The trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the

purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Although not raised by Houston, we note that the trial court could not apply enhancement factor (3), that the offense involved more than one victim, because that factor may not be used to enhance a sentence where a defendant is separately convicted of the offenses committed against each victim. State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995). The court also could not apply factor (9), that the defendant employed a firearm during the commission of the offense, because the appellant was indicted and separately convicted of employing a firearm during the commission of a dangerous felony. Nevertheless, the trial court's proper application of the other enhancement factors justified his twenty-year sentence for attempted first degree murder. See Bise, 380 S.W.3d 709-10 (holding that despite the misapplication of an enhancement factor, a sentence "should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute").

As to consecutive sentencing, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

In this case, the trial court imposed consecutive sentencing upon finding that the appellant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(5). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). "Where . . . the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority" and can either conduct a de novo review to determine if an adequate basis exists for consecutive sentences or remand the case to the trial court for consideration of the requisite Wilkerson factors. Pollard, 432 S.W.3d at 864-65.

Turning to the instant case, the trial court specifically addressed the <u>Wilkerson</u> factors and found that consecutive sentencing was necessary to protect the public from Houston and that consecutive sentencing reasonably related to the severity of the offenses. Specifically, the trial court was troubled by the fact that the appellants chased down the victims while firing an automatic weapon and continued to fire at the victims after the Crown Victoria had wrecked and the victims were incapacitated. Earlier in the hearing, the trial court noted that the incident "all had to do with some type of a financial disagreement and that [the appellants] then engaged in activity that, in this Court's mind is extremely serious." The court also noted "the sheer boldness" of the crimes and stated that "who knows who was placed at risk under the circumstances." Therefore, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing based on Houston's being a dangerous offender.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court committed reversible error in Swift's case by refusing to sever the appellants' trials and by allowing the State to show the jury an assault rifle that was not used in the crimes. Therefore, Swift's convictions are reversed, and his case is remanded to the trial court for a new trial. Houston's convictions and sentences are affirmed.

_____
NORMA MCGEE OGLE, JUDGE